# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

Central Islip Division

| | | |
|---|---|---|
| CICEL (BEIJING) SCIENCE & TECHNOLOGY CO., LTD. | ) | ___ CV _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Jury Trial Demanded** |
| -v- | ) | |
| | ) | |
| MISONIX, INC., STAVROS VIZIRGIANAKIS, | ) | |
| SCOTT LUDECKER, JOHN SALERNO, RICHARD | ) | |
| ZAREMBA, JOHN W. GILDEA, CHARLES MINER III, | ) | |
| PATRICK McBRAYER, and THOMAS M. PATTON, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Cicel (Beijing) Science & Technology Co., Ltd. ("Cicel" or the "Plaintiff"), by

and through its undersigned counsel, DeHeng Chen, LLC, for its complaint against Defendants

Misonix, Inc. ("Misonix"), Stavros Vizirgianakis, Scott Ludecker, John Salerno, Richard

Zaremba, John W. Gildea, Charles Miner III, Patrick McBrayer, and Thomas M. Patton

(collectively, "Defendants") states as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.       Plaintiff Cicel is a Chinese corporation, having its principal place of business in

Beijing, China.  Cicel is engaged in the business of promoting, marketing, obtaining product

registrations and distributing medical devices in China.  During relevant times, Cicel developed

an extensive distribution network across China, with seven offices nationwide, and developed

1

close working relationships with top-class surgeons, hospitals and medical organizations across China.

2.       Upon information and belief, Defendant Misonix is a New York corporation, engaged in the business of manufacturing medical devices, that has its principal place of business located at 1938 New Highway, Farmingdale, New York 11735.

3.       During relevant times, Defendant Stavros Vizirgianakis has been the Chairman of the Board, President and CEO of Misonix and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

4.       During relevant times, Defendant Scott Ludecker has been the Senior Vice-President of Global Sales and Marketing for Misonix and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

5.       During relevant times, Defendant John Salerno has been the Senior Vice-President of Regulatory Affairs for Misonix and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

6.       During relevant times, Defendant Richard Zaremba has been the Senior Vice-President of Finance for Misonix and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

7.       During relevant times, Defendant Charles Miner, III, has been a Misonix director and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

8.      During relevant times, Defendant Patrick McBrayer has been a Misonix director and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

9.      During relevant times, Defendant Thomas M. Patton has been a Misonix director and has personally, knowingly, and in bad faith instigated, participated in, and approved the Defendants' wrongdoing alleged in this complaint.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332, in that complete diversity exists between the parties and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), as the county of Defendant Misonix's residence.

## BACKGROUND OF THE ACTION

12.      This diversity action arises out of an exclusive distribution agreement between the parties under which Plaintiff Cicel had the exclusive distribution rights in China (including Hong Kong) to certain Misonix medical device products.  Although the Agreement's term was to run from June 1, 2013 to at least May 17, 2018, Defendants caused Misonix to wrongfully terminate the Agreement by letter dated September 27, 2016, and Defendants engaged in unfair competition, tortiously interfered with Cicel's contracts and prospective contractual relations with customers, and caused Misonix to wrongfully fail to return at least $202,148.22 in monies previously submitted by Cicel to  Misonix for product orders that Misonix willfully and wrongfully refused to fill.

## FACTS COMMON TO ALL CLAIMS

13.     Cicel's relationship with Misonix as a distributor of Misonix products in China began in or around May 1, 2010.  Pursuant to an earlier "Sole Distribution Agreement," orders of Misonix products amounted to millions of dollars per year, with Misonix being named the top Misonix global distributor.

14.     On or about May 20, 2013, Cicel and Misonix entered into a subsequent "Sole Distribution Agreement" (the "Agreement," Ex. A hereto).  Pursuant to Agreement Sections 2.1 and 2.2, Cicel was to be the sole/exclusive distributor for resale of certain Misonix products in China, including Hong Kong (collectively, the "Territory").  As set forth in Exhibit 1 to the Agreement, those products included: (a) the SonaStar Ultrasonic Aspiration System, Accessories and Disposables (the "SonaStar System"); and (b) the BoneScalpel Ultrasonic Bone Cutting System, Accessories and Disposables (the "BoneScalpel" and together with the "SonaStar System," the "Products").

15.     The Agreement's term was to commence on June 1, 2013 and run for 60 months following the registration of the last product approved for sale.  Because registration of the BoneScalpel was issued on May 17, 2013, the Agreement's term was to run until May 17, 2018, pursuant to Agreement Sections 12.1 and 12.2.

16.     Under Agreement Section 2.3, the parties expressly contemplated that Cicel would obtain/appoint sub-distributors for the Products in the Territory.  Cicel, in fact, did so, entering sub-distributorship contracts for the Products with multiple third-party distributors and medical facilities in the Territory, with the knowledge and approval of Misonix.  Through considerable time, effort and expense, Cicel succeeded in building a successful distribution network to effectively market and sell Misonix products throughout the Territory and further

4

developed close working relationships with top-class surgeons, hospitals and medical organizations across China.

17.     Consistent with Misonix's knowledge of Cicel's sub-distributorship contracts with third-parties, Misonix contractually agreed to "use all reasonable endeavors to accept and fulfil orders placed by Distributor [Cicel]," with the filling/delivery of such orders to be completed around "30 days ARO" [after receipt of order] under Agreement Sections 3.2 and 4.1.

18.     Under Agreement Section 6.1.4, it was expressly recognized that Cicel would be using "its best endeavors to develop, promote and expand the sale, distribution and usage of the Products throughout the Territory."

19.     Consistent with Cicel's extensive efforts and investment in developing, promoting and expanding the sale, distribution and usage of the Products in the Territory," the Agreement provided that the Agreement could only be terminated by Misonix for limited, enumerated reasons under Agreement Section 13.  Those enumerated reasons were:

(a) Cicel's breach of the Agreement, where the breach was not remedied within 15 days after written notice by Misonix requiring a remedy of same (Agreement Section 13.1.1);

(b) If Cicel or Misonix was declared bankrupt or became insolvent or subject to proceedings pertaining to the relief of debtors or the settlement of debts (Agreement Section 13.1.2);

(c) If Cicel failed to meet the minimum purchase requirements for two (2) consecutive quarters (Agreement Section 13.1.3); and

(d)  If there was a material change in Cicel's "present management, organization, ownership and location" (Agreement Section 13.2).

20.     At no relevant time has any of the foregoing grounds for terminating the Agreement ever come into being.  Indeed, during relevant times, Cicel continued to be a top global distributor of Misonix products and the distribution of Misonix products came to constitute approximately 70% of Cicel's business.  Misonix's business relationship with Cicel was highly profitable for Misonix during all relevant times.

21.     Despite Cicel's strong performance as Misonix's exclusive distributor of the Products in the Territory under the Agreement and the highly profitable nature of Misonix's business relationship with Cicel, Misonix abruptly and wrongfully ceased filling Cicel's orders in or around May 2016 and also began refusing to repair or replace Products under warranty, while retaining and refusing to return Cicel's order deposits of not less than $202,148.22, and further purported to terminate the Agreement by letter dated September 27, 2016 (the "Termination Letter," Ex. B hereto), following which Misonix began wrongfully distributing its product through another  company in the Territory.  Tellingly, the Termination Letter did not cite any of the limited, enumerated grounds for terminating the Agreement as required by Agreement Section 13, consistent with the fact that no grounds for validly terminating the Agreement existed.

22.     Upon information and belief, Misonix's foregoing wrongful conduct was motivated by Defendants' bad faith scheme and desire to wrongfully enrich themselves at Cicel's expense by, *inter alia:* (a) cutting Cicel out of the distribution network built by Cicel itself; and (b) misappropriating Cicel's distributor network in the Territory for itself and/or for a replacement distributor in the Territory selected by Misonix, so that such distribution would be conducted on terms more favorable to Defendants.

23.     As part of and to facilitate Defendants' foregoing bad faith, intentionally wrongful scheme, Defendants engaged in wrongful, deceptive, and tortious acts that included obtaining detailed and confidential business information generated and/or obtained by Cicel under false pretenses to better enable Defendants to cut Cicel out of the distribution network for Misonix Products in the Territory.

24.     For example, in an email dated November 14, 2014 (Ex. C hereto), Misonix requested detailed and confidential business information generated and/or obtained by Cicel under the false pretense of "building trust and sharing information" to strengthen the business relationship between Cicel and Misonix. The requested information included information concerning the location of BoneScalpels, who was using those products, whether the usage was increasing, whether other doctors were sharing the products, whether new doctors using the product had been trained well, as well as information about competing products manufactured in China.

25.     In an email dated June 1, 2015 (Ex. D hereto), Misonix demanded "specific" information from Cicel for the period July 1, 2014 through May 31, 2015 concerning, *inter alia*:

    (a)     "The number of BoneScalpel ("BS") systems in use in a hospital on a weekly basis with the name of the doctor and the hospital";

    (b)     "The name of each Province in which BS's have been sold with the number of sales this year by Province through May 2015";

    (c)     "The name of each Province covered by a sub-distributor to Cicel";

    (d)     "The number of Cicel employees in sales today and the number of employee clinical specialists capable of training a doctor on BS";

(e)    "The name and hospital association of Key Opinion Leaders ("KOL's") doctors";

(f)    "the average price of the BS, in dollars, for a system in May of 2015";

(g)    "a forecast for 12-months for BS systems for 12 months from July 2016 through June 2016 per quarter and the same for SonaStar"; and

(h)    "a report on the activities of competitors to the BS and SonaStar to include price, new features, and frequency changes and, if possible, pictures of new blades or probes."

26.    In that email, Misonix deceptively justified its demand for information as being consistent with "good communications, transparency between partners, a commitment to work together to build a real business to benefit both partners and to do what we promise as true partners." (Ex. D hereto).

27.    In a September 1, 2015 email, Misonix continued requesting confidential business information from Cicel including, *inter alia*, a "Current target list of hospitals/surgeons that your company is working on," where Cicel was in that process, a list of "the important surgeons (volume of cases, KOL, teachers) in the country". (Ex. E hereto).

28.    In a December 21, 2015 email (Ex. F hereto), Misonix requested, *inter alia*, the following confidential information from Cicel:

(a)    The "Top 10 key targeted hospitals" for BoneScalpel and/or SonaStar that were not yet Misonix customers;

(b)    The "top 5-10 targeted Key Opinion Leaders that we would like to turn into BS or SS advocates";

(c)    The "Key Competition" and their pricing and product features.

8

29.     Misonix deceptively justified this request for information on the ground that such information would help Misonix "refine our strategy so as to better meet your [Cicel's] needs and help you stay as competitive as possible." (Ex. F hereto).

30.     In an email dated April 19, 2016 (Ex. G hereto) – about a month before Misonix abruptly and unilaterally ceased filling Cicel's orders – Misonix requested that Cicel have its sub-distributors "identify their top ten most important hospitals in their territory for both BoneScalpel and Sonastar" and requested that Cicel "create a list of the top 10 spinal surgery hospitals and top 10 neuro and/or liver surgery hospital targets along with the top 10 key surgeons in each hospital."

31.     In emails dated May 17 and May 24, 2016 (collectively annexed as Ex. H hereto) – just before Misonix abruptly and unilaterally ceased filling Cicel's orders – Misonix asked Cicel to compile "a list of key target hospitals and the KOL [Key Opinion Leaders] surgeons that practice in each."  Misonix deceptively justified its request for this information as being in the parties' "mutual interest," never disclosing that Misonix intended to imminently cease dealing with Cicel.

32.     Misonix further concealed its plans to terminate its Agreement with Cicel by falsely assuring Cicel that its relationship with Misonix remained strong.  In an April 27, 2016 email from Misonix's then-CEO, Michael McManus, to Cicel's CEO, May Lee (Ex. I hereto), Misonix stated:

> May my friend. I know you have been traveling and then back to China. I am sorry about the confusing conversations and mixed messages you believe you are getting. Lily said you would be in the US . When can we meet in NY or Chi for a good long discussion between partners? Best. Mike

33.     In a May 21, 2016 email (Ex. J hereto) – very shortly before Misonix abruptly and unilaterally ceased filling Cicel's orders – Misonix's then-president, Michael McManus, again

wrote to Cicel's CEO, May Lee, and flatly denied any plan by Misonix to terminate its dealings

with Cicel, stating in pertinent part:

> I am a firm believer in the relationship with people being the greatest driver of business. **I was very upset to hear people tell me that Cicel thought we were asking questions to try to terminate the Agreement we have. That was never true and I don't know why someone would do that. We are fortunate to have Cicel and its people have done a good job for us** . . . . I heard you had a good meeting with Scott [Ludecker]. I hope you feel that is true. I told him [Ludecker] to be sure to make it clear to you that I believe in Cicel and May. I believe that together we can solve problems with respect and understanding . . . . I hope you got the message very clear that Cicel, May, and her team are trusted friends. We are not looking to terminate anyone. We are looking to build understanding and to help one another . . . . (Emphasis added).

34.    Cicel, in good faith and in reasonable reliance on Misonix's representations as to

why Misonix needed the requested information and the state of Cicel's relationship with

Misonix, provided its confidential and proprietary information to Misonix, which information

Cicel had gathered and/or formulated pursuant to a considerable investment of time and expense.

Defendants then misappropriated that confidential and proprietary information to enrich

themselves at Cicel's expense by abruptly, unilaterally and unjustifiably cutting Cicel out of the

distribution network for Misonix products in the Territory, and by ceasing all shipments of

Product and related customer service to Cicel and its customers in late May 2016.

35.    Misonix's abrupt cessation of shipments and customer service over the ensuing

months – at and with the knowing direction, instruction and approval of the individual

Defendants – caused serious problems for Cicel and its customers as documented in emails.   In

an August 24, 2016 email (Ex. K hereto), Lily Jiang of Cicel wrote to Defendant Ludecker of

Misonix stating in pertinent part:

> . . . . it's really difficult for us to understand that even the non-HF items are hold by your board now. We [Cicel] have emphasized many times the urgency and importance of delivery as early as possible, but our words are so powerless to your board. Since the business now and in near future in China is the less concern

of your board at this moment, there is limited we could do to push things forward. We have to slow down our promotion such as trials, but we have no way to leave our existing customers alone. We strongly requesting you to perform your obligation to provide necessary service to customers who have already purchased and installed our systems, in other words, you are obligated to supply disposables to the to ensure the normal running of the systems . . . . This is the first time we have such a big trouble, our good reputation we built through our twenty-year's continuous effort is being seriously damaged due to your internal problem . . . .

36.     In an August 25, 2016 email response (Ex. L hereto), Defendant Ludecker of Misonix confirmed that Misonix's ceasing of shipments was at the direction of Misonix's board of directors, stating in pertinent part: "I fully understand your frustration and equally share the same frustration in our not being able to release product for shipment at this time. On a daily basis I am working to receive formal confirmation from our Board of Directors as to how Misonix management is allow[ed] to proceed."

37.     In or around September 2016, Misonix revealed its plan to end its business relationships with Cicel. In a September 2, 2016 email (Ex. M hereto), Misonix confirmed its plan to end its relationship with Cicel stating: "As per our conversation this morning with May and Simon, we would hope to begin discussions tomorrow as to how to properly wind down the business relationship between Cicel and Misonix."

38.     That same email (Ex. M hereto), betrayed that Misonix's prior requests to Cicel for information had been motivated by its previously undisclosed plan to terminate Cicel. Misonix acknowledged that the very sort of information that it had been requesting of Cicel for over a year "was necessary" for its planned transition after terminating Cicel, by reiterating its requests for updated versions of such information, thus underscoring that Misonix had been planning to cut Cicel out for many months. That email specifically sought from Cicel, *inter alia*, information concerning:

    (a)     "records for where the systems have been sold in PRC [People's Republic of China], hospital name, contact name, address, product sold, serial number, date of sale, etc.";

    (b)     "Name and contact information for any possible sub-distributors that Cicel may have entered into a relationship with for Misonix products and terms of any contracts that may exist";

    (c)     "Full list of Surgeon Key Opinion Leaders for all products"; and

    (d)     "An accounting of all remaining, unsold, inventory that Cicel has; Number of systems for Sonastar and BoneScalpel".

39.    Upon information and belief, Defendants also have engaged in a bad faith campaign to damage Cicel's hard-earned business reputation and thereby weaken its relationship with its sub-distributors, hospitals and other customers. To that end, upon information and belief, Misonix began spreading false and defamatory rumors that Cicel was involved in giving bribes to Chinese governmental officials, in violation of the Foreign Corrupt Practices Act ("FCPA").

40.    Consistent with and in furtherance of that bad faith scheme to damage Cicel's business reputation, on September 28, 2016, Misonix filed a Form 8-K with the Securities and Exchange Commission (Ex. N hereto) announcing, *inter alia,* that it had

> … contacted the Securities and Exchange Commission ("SEC") and the U.S. Department of Justice ("DOJ") to voluntarily inform both agencies that the Company may have had knowledge of certain business practices of the independent Chinese entity that distributes its products in China, which practices raise questions under the Foreign Corrupt Practices Act ("FCPA").

41.     Misonix's 8-K clearly referred to Cicel, as Misonix's exclusive distributor of its Products in China.

42.     Misonix's insinuation that Cicel had engaged in criminal conduct under the FCPA was not only baseless, but knowingly baseless. Cicel has not engaged in and denies any such wrongdoing. Indeed, while Misonix's Form 8-K asserted that Misonix had launched an internal investigation and referred to Misonix's purported cooperation with the SEC and DOJ, Misonix has never come forward with any evidence whatsoever that Cicel engaged in any wrongdoing, despite Cicel's multiple written and in-person requests that it do so and explain why Misonix was ceasing shipments, ceasing repairs/replacements under warranty, and terminating the Agreement. Indeed, Misonix's roughly simultaneous Termination Letter, dated September 27, 2016, makes no reference to any wrongdoing whatsoever by Cicel and specifies no reason for the Agreement's termination by Misonix. To date, Cicel has not been contacted by the SEC or DOJ concerning any purported FCPA violations.

43.     Misonix's foregoing intentionally wrongful and tortious conduct has seriously damaged Cicel's business, its business reputation, and its relationships with its sub-distributor network. In a September 20, 2016 email (Ex. O hereto), Cicel's CEO, May Lee, wrote to Defendant Ludecker of Misonix, stating in pertinent part:

> I am very sad to know that your board wants to wind down the relationship between Cicel and Misonix, it's unacceptable for Cicel. Cicel has promoted Misonix's products for several years with plenty of energy, time, resources and money in China. Cicel has helped Misonix to improve its qualities of Sonostar and BoneScaple [sic] for three years. Cicel has got a lot of the potential projects for Sonostar and BoneScaple next year in China. We have the effective contract with Misonix now . . . . Cicel's business comes from Misonix, it's about more than 70%. Now we are waiting for your delivering SS [Sonastar] and BS [BoneScalpel] that we have had these orders for several months, the Chinese customers have been angry to Cicel. Now we haven't any repair parts for SS and BS, we couldn't supply any accessories to our customers who have owned these ptoducts [sic] now. Although you want to stop our cooperation, you should

carry out the setps [sic] according to our contract and international law.  You haven't had any notice to Cicel your board's intention before September 2016.

44.     Because of Misonix's intentionally wrongful and tortious conduct, Cicel has been prevented from meeting its contractual commitments to its sub-distributors and medical facilities to supply them with and to service the Products, which has resulted in Cicel being subjected to actual and threatened lawsuits, Cicel being found liable or being pressured to settle such lawsuits for substantial sums, and the termination of many of its business relationships.  Moreover, due to Misonix's refusal to supply Cicel with the Products, spare parts for the Products, and to provide the required customer cservice and supplies for the Products, many of Cicel's customers have made plain that they will not do further business with Cicel.  In addition, Cicel has been told by the Shanghai Province governmental authorities that it has been effectively blacklisted because of Cicel's inability to perform, due to Misonix's wrongful conduct, following Cicel's submission of a winning contract bid to supply Products to hospitals and medical facilities in the Province. Additional harm of that nature is imminent and ongoing and continues to further threaten Cicel with irreparable harm.

## COUNT ONE: UNFAIR COMPETITION (AGAINST ALL DEFENDANTS)

45.     Cicel repeats and realleges the allegations set forth in in Paragraphs 1-44 as if fully set forth herein.

46.     Defendants have obtained confidential and proprietary business information from Cicel under false and deceptive pretenses.

47.     Defendants have misappropriated Cicel's confidential information, which Cicel gathered and formulated through considerable labors, skills, expenditures and good will, to unfairly enrich itself at Cicel's expense.

48.     Defendants also have misappropriated Cicel's labors, skills, expenditures and good will by undermining Cicel's reputation and relationships with Cicel's sub-distributors and other customers by, *inter alia*, knowingly and falsely accusing Cicel of criminal conduct and by refusing to fill Cicel's orders for Misonix Products received from Cicel's sub-distributors and other customers.  Through such wrongful tactics, Defendants have cut Cicel out of the distribution network, for Misonix Products in the Territory, that Cicel itself created through its labors, skills, expenditures and good will.

49.     Such misappropriation was committed by Defendants in bad faith for the commercially immoral and wrongful purpose of having Defendants enrich themselves, at Cicel's expense, by cutting out Cicel from the distribution network, for Misonix Products in the Territory, that was created by Cicel.

50.     Defendants' conduct constitutes common-law unfair competition.

51.     As a result of Defendants' wrongful conduct, Cicel has suffered and will continue to suffer damages including, but not limited to, damages flowing from the induced breach of Cicel's agreements with its sub-distributors; the sub-distributors' filing of lawsuits against Cicel for such induced breach; many sub-distributors, hospitals and medical facilities refusing to do further business with Cicel in various provinces in China; the loss of Cicel's business reputation; and Cicel's loss of actual business and prospective business relationships that it had spent years and tremendous amounts of energy, effort and money in developing.

52. By reason of Misonix's wrongdoing, Cicel has been damaged in an amount to be proven at trial, but not less than Fifty Million Dollars ($50,000,000), and is further entitled to an award of appropriate punitive damages, jointly and severally against all Defendants.

53. In addition, Cicel is entitled to appropriate preliminary and post-judgment injunctive relief.

## COUNT TWO: TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST ALL DEFENDANTS)

54. Cicel repeats and realleges the allegations set forth in in Paragraphs 1-53 as if fully set forth herein.

55. During relevant times, Cicel had valid and enforceable agreements with its sub-distributors and other customers in China to supply them with the Products and to procure related supplies, replacement parts and customer service for them.

56. Defendants each had actual knowledge of those agreements and their specific terms, having approved them pursuant to Agreement Section 2.3 and having obtained such information under false pretenses from Cicel.

57. Defendants intentionally and improperly procured and forced Cicel's breach of those agreements by causing Misonix to cease shipment of Products, replacement parts and related supplies to Cicel despite accepting Cicel's payments of such shipment orders, refusing to repair or replace defective Products under warranty, by actively and intentionally seeking to undermine Cicel's business reputation, and by wrongfully terminating the Agreement. But for the foregoing wrongful conduct, no such breach of the agreements would have occurred.

58. Defendants' intentional interference was wrongful in nature and without justification.

59.     As a result of Defendants' wrongful conduct, Cicel has suffered and will continue to suffer damages including, but not limited to, damages flowing from the induced breach of Cicel's agreements with its sub-distributors and customers; the sub-distributors' filing of lawsuits against Cicel for such induced breach; many sub-distributors, hospitals and medical facilities refusing to do further business with Cicel in various provinces in China; the loss of Cicel's business reputation; and Cicel's loss of actual business and prospective business relationships that it had spent years and tremendous amounts of energy, effort and money in developing.

60.     As a result, Cicel has been damaged and is entitled to an award of compensatory damages in an amount to be proven at trial, but not less than Fifty Million Dollars ($50,000,000), and is further entitled to an award of appropriate punitive damages, jointly and severally against all Defendants.

61.     In addition, Cicel is entitled to appropriate preliminary and post-judgment injunctive relief.


COUNT THREE: TORTIOUS INTERFERENCE WITH
PROSPECTIVE CONTRACT (AGAINST ALL DEFENDANTS)

62.     Cicel repeats and realleges the allegations set forth in Paragraphs 1-61 as if full set forth herein.

63.     During relevant times, Cicel had contractual offers from and/or prospective business relationships with a number of sub-distributors, hospitals and governmental entities in the Territory.

64.     During relevant times, Defendants knew of those contractual offers and/or prospective business relationships.

17

65.     Defendants directly interfered with Cicel's prospective relationships with those third-parties by the use of dishonest, unfair or improper means.

66.     As a result, Cicel has been damaged in an amount to be proven at trial, but not less than Fifty Million Dollars ($50,000,000) and is further entitled to an award of appropriate punitive damages, jointly and severally against all Defendants.

67.     In addition, Cicel is entitled to appropriate preliminary and post-judgment injunctive relief.

## COUNT FOUR: BREACH OF THE SOLE DISTRIBUTION AGREEMENT (AGAINST ALL DEFENDANTS)

68.     Cicel repeats and realleges the allegations set forth in Paragraphs 1-67 as if fully set forth herein.

69.     Misonix has breached the Agreement.

70.     Misonix's breach was personally, knowingly, and in bad faith instigated, participated in, and approved by the other Defendants.

71.     By reason of said breach, Cicel is entitled to compensatory damages in an amount to be proven at trial, but not less than Fifty Million Dollars ($50,000,000) jointly and severally against all Defendants.

72.     In addition, Cicel is entitled to appropriate preliminary and post-judgment injunctive relief.

## COUNT FIVE: CONVERSION (AGAINST ALL DEFENDANTS)

73.     Cicel repeats and realleges the allegations set forth in Paragraphs 1-72 as though fully set forth herein.

74.     Misonix was paid by Cicel for Products that Misonix subsequently refused to deliver in the amount of at least $202,148.22.   After multiple requests by Cicel that Misonix honor its contractual obligations, Misonix purported to return $155,426.68 of those monies by check, but that check was dishonored and Defendants never corrected that situation.

75.     Despite continuing requests by Cicel, Defendants have failed to return the funds to Cicel, thereby willfully converting Cicel's funds.

76.     By reason of Defendants' conversion, Cicel has been damaged in an amount to be proven at trial, but not less than $202,148.22, jointly and against all Defendants.

## COUNT SIX: FRAUDULENT INDUCEMENT (AGAINST ALL DEFENDANTS)

77.     Cicel repeats and realleges the allegations set forth in Paragraphs 1-76 as though fully set forth herein.

78.     During relevant times, Defendants knowingly and intentionally made material misrepresentations of fact and/or knowingly and intentionally omitted to disclose material facts to Cicel in connection with Defendants' requests for confidential and proprietary business information from Cicel.

79.     At the time those misrepresentations and/or omissions were committed, Defendants knew them to be materially false and/or materially misleading, but made them to induce Cicel to rely on them by disclosing confidential business information to Misonix.

80.     Cicel justifiably and reasonably relied on Defendants' material misrepresentations and/or omissions to its detriment.

19

81.     As a result, Cicel has been damaged in an amount to be proven at trial, but not less than Fifty Million Dollars ($50,000,000), and is entitled to an appropriate award of punitive damages, jointly and severally against all Defendants.

82.     In addition, Cicel is entitled to appropriate preliminary and post-judgment injunctive relief.

**WHEREFORE,** Plaintiff Cicel hereby demands judgment jointly and severally against all Defendants as follows:

A.     On the First Count: compensatory damages in an amount to be proven at trial, but not less than $50,000,000, as well as appropriate punitive damages and preliminary and post-judgment injunctive relief;

B.     On the Second Count: compensatory damages in an amount to be proven at trial, but not less than $50,000,000, as well as appropriate punitive damages and preliminary and post-judgment injunctive relief;

C.     On the Third Count: compensatory damages in an amount to be proven at trial, but not less than $50,000,000, as well as appropriate punitive damages and preliminary and post-judgment injunctive relief;

D.     On the Fourth Count: compensatory damages in an amount to be proven at trial, but not less than $50,000,000, as well as appropriate preliminary and post-judgment injunctive relief;

E.     On the Fifth Count: compensatory damages in an amount to be proven at trial, but not less than $202,148.22;

F.      On the Sixth Count: compensatory damages in an amount to be proven at trial, but not less than $50,000,000, as well as appropriate punitive damages and preliminary and post-judgment injunctive relief; and

G.      Pre-judgment and post-judgment interest, attorneys' fees, costs, and such other and further relief as the Court deems just and appropriate.


Dated:   March 23, 2017

                              Respectfully submitted,

                              DEHENG CHEN, LLC

                              By: _____
                                    Dean T. Cho (DC7986)
                              233 Broadway, Suite 2200
                              New York, New York 10279
                              (718) 344-8188

                              Counsel for Plaintiff